**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC LYONS, | : | Civil No. 3:07-CV-2278 |
| | : | |
| Plaintiff, | : | (Judge Conner) |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| JEFFREY BEARD, et al., | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I.   Introduction

This case, which comes before the Court on a motion for summary judgment filed by the sole remaining corrections defendant in this *pro se* prisoner civil rights action, presents questions concerning the contours of a prisoner's right of access to the courts, and the scope of a government official's qualified immunity from damages. Specifically, this case poses the question of whether a prison official who complies with constitutionally valid institutional inmate document retention policies can be held personally liable for impairing an inmate's access to the courts when the inmate seeks to blame his lack of legal success in other cases on his loss of some records in his voluminous personal legal files.

While the inmate-plaintiff in this case, Eric Lyons, invites us to find that his lack of success in this other litigation was a product of misconduct of the prison

property custodian, Andrew Huber, who followed legally-valid agency procedures in disposing of Lyons' excess property, the court records in those other proceedings tell a starkly different story. Those court records affirmatively reveal that Lyons' lack of success in these other legal proceedings, which involved challenges by Lyons to his 2002 conviction for the kidnaping, rape and attempted murder of an 8 year-old girl, was not a function of limited access to court records, as Lyons asserts in this lawsuit. Rather, in each instance the courts carefully examined the merits of Lyons' claims, and rejected those claims on their merits. In short, the state and federal courts which have examined Lyons' conviction and sentence have uniformly addressed the merits of his post-conviction claims and found that he was justly convicted of sexually assaulting and attempting to kill this child.

Given these facts, since property officer Huber applied a facially valid agency policy relating to inmate document retention when he disposed of certain files belonging to Lyons, and because Lyons has not shown that he suffered any prejudice in this litigation that can be traced in any way to Huber's actions, we find that this Defendant is entitled to qualified immunity from damages, and recommend that this motion for summary judgment be granted.

## II.    Statement of Facts and of the Case

The history of this case involves the interplay of state and federal legal actions filed by the Plaintiff, Eric Lyons, challenging Lyons' 2002 conviction for the kidnaping, rape and attempted murder of an 8 year-old girl, and calls upon us to examine whether a prison property officer, Andrew Huber, in some way prejudicially interfered with Lyons' access to the courts in this state and federal litigation. Therefore, some consideration of the facts, circumstances and litigation history relating to Lyons' underlying crimes is essential to an understanding of his current constitutional claims, since this litigation history sheds great light on this issue of whether Lyons' right of access to the courts was unconstitutionally impaired.

### A.    Lyons' State and Federal Criminal Litigation of His Kidnaping, Rape and Attempted Murder Case–2001 to 2007

This case began ten years ago, with the brutal assault of an eight year old girl, who was kidnaped from her bed, raped, sodomized and left for dead. The cruel background of this crime has been described by one of the federal courts that has rejected Lyons' habeas corpus petition in the following terms:

> This case involves the kidnaping, rape, and attempted murder of an eight-year-old girl, "M.R." The crimes against her were committed on the night of February 15, 2001, when a male intruder entered her family's home on Myrtle Street in Erie, Pennsylvania, sometime before 9:00 p.m. M.R. was asleep in her bedroom. The intruder woke her up,

held a knife to her throat, and carried her out of the home and into his car. He drove her to a second location, where he raped her and assaulted her in many ways, and then told her that he was going to kill her. Using a strip of cloth that he had torn from a blanket, the man strangled M.R. and bound her limbs. He dumped her in a snowbank near a trucking company, leaving her to die. Somehow M.R. survived the horrific attack. When she regained consciousness she was unable to walk due to her injuries. She crawled to a fence, where Joseph Nason and Brett King, who worked with the trucking company, heard her screaming around 1:15 a.m. on February 16, 2001. M.R. told King that "he brought me here."

Lyons v. Wilson, No. 07-214, 2010 WL 2253751, *1 (W.D.Pa. Feb. 10, 2010).

Within days of this brutal assault, a compelling mosaic of proof began tying Lyons to this crime.[1] At the outset, Lyons was linked to the crime of his victim, who survived this brutal assault and provided police details regarding the reported age, appearance and attire of her assailant, all of which matched Lyons. For example, the victim correctly identified Lyons' age, which had been reported to her by her attacker, and described the clothing that Lyons wore when he attacked her. Lyons, in turn, chose to wear the same attire when he met with police to provide them with a DNA sample. Indeed, the victim was able to provide a sufficiently detailed description of her attacker that investigators were able to prepare a composite drawing of the

---

[1]This factual narrative is derived from the detailed statement of facts in Lyons v. Wilson, No. 07-214, 2010 WL 2253751(W.D.Pa. Feb. 10, 2010).

assailant. Witnesses later reported to police that Lyons resembled the man depicted in the composite drawing prepared from the victim's description.

The victim also reported that her attacker drove a specific make and model of car, a 1994 four-door Buick LeSabre, which was identical to one of the cars owned by Lyons. Furthermore, the victim of this assault identified articles that her abductor had concealed in his car, where he raped and assaulted her. When police searched Lyons' car they found the articles described by the victim secreted inside that automobile, along with knives, condoms, pornographic magazines and several pairs of children's underpants.

The child victim further told police that her attacker claimed that he had been stalking children in her neighborhood, and had been peeping at her through her window. Investigating this report, police found an eyewitness, who identified Lyons as a man who he had observed in the victim's neighborhood several days before the attack, peeping into neighborhood windows. This eyewitness linked the stalker he had seen to a car, which was also registered to Lyons.

Lyons was then separately linked to this cruel crime in multiple ways through immutable, scientific evidence. Thus, evidence, including hairs recovered from the child victim's body, were directly tied to Lyons through DNA analysis. Similarly, fibers recovered from the victim's body were scientifically linked to carpet fibers

found in Lyons' car. Furthermore, boot prints found at the scene of the victim's abduction, and at the scene where her body had been dumped by her attacker, matched Lyons' boots.

Lyons also made a series of statements, both admissions and false exculpatory statements, which tied him to this crime. While in jail, Lyons correctly described to a fellow inmate the race and ethnicity of his victim, information which had not been released publicly. Lyons then acknowledged that he had tried to dispose of evidence in his car that would tie the girl to the vehicle; but admitted that police found a hair on the girl that they were linking to him by DNA analysis.

Police also documented that Lyons had reported late to his employment on the night of the crime, February 15, 2001. When questioned regarding his whereabouts that evening, Lyons initially offered four different accounts of his activities. Lyons later abandoned all four of these stories, and endeavored to present a fifth different description of his actions on the night of the crime at his trial in the form of an alibi defense.

Lyons was arrested on February 23, 2001, and charged with kidnaping, rape and attempted murder. Initially represented by court-appointed counsel, Lyons discharged those attorneys in August, 2001, and became the sole architect of his defense. In November of 2001, following an eight-day trial, a jury found Lyons guilty

on all charges. (Doc.86, Lyons Dep. at 12.) On January 30, 2002, Lyons was sentenced to a prison term of no less than 79 years and two months to 158 years and four months.( Doc 86, Lyons Dep. Exh. 2 at 2.) Lyons then began a decade-long legal foray in the state and federal courts challenging his conviction and sentence, as he also commenced service of his state sentence for these crimes. Lyons' efforts to set aside this conviction began on June 13, 2002, when Lyons filed an appeal to Pennsylvania's Superior Court.( Doc. 86, Lyons Dep. Exh. 2 at 3.)

In this 2002 appeal Lyons began asserting the very claim which he now suggests he has been barred from presenting to the courts by the actions of property officer Huber in 2006. Specifically, Lyons' direct appeal focused on what he now claimed was an alibi defense, and what Lyons argued was the improper denial of his right to call a woman, Joan Edenfield, as an alibi witness notwithstanding the fact that he had not given the prosecution notice of his intent to call alibi witnesses. By couching his claims on direct appeal in this fashion, Lyons made an admission concerning this issue which is relevant to our current inquiry. Lyons' entire argument on appeal regarding the exclusion of this witness rests on the premise that Lyons knew of Ms. Edenfield prior to his trial, was aware that she might provide him an alibi after the first four alibis he presented to the police fell through, but failed to timely notify the state of his intent to call her as an alibi witness.

Presented with Lyons' claims regarding this alibi witness, the Superior Court affirmed Lyons' conviction and sentence on September 22, 2003, three years prior to the events encompassed in this lawsuit. Commonwealth v. Lyons, 833 A.2d 245 (Pa.Super. 2003). In affirming this conviction, the Superior Court held that there was no error in excluding alibi testimony by Joan Edenfield, since Lyons knew of this witness but had not properly notified the Commonwealth of this alibi witness. Id. at 257. Lyons then filed a petition for allocator with the Pennsylvania Supreme Court which was denied by the Supreme Court. (Doc. 86, Lyons Dep. at 17-18.)

With his direct appeals exhausted, Lyons began a second foray into the courts when he filed a pro se Post Conviction Relief Act petition with the Court of Common Pleas of Erie County on February 2, 2006. Lyons v. Wilson, supra, 2010 WL 2253751 at 7. In this petition, which was filed months before the events set forth in this civil lawsuit, Lyons "contended that the prosecution suppressed police and bank records pertaining to purported alibi witness Joan Edenfield . . . in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963). Lyons further contended that his first court-appointed counsel, Richmond and Murphy, were ineffective for not investigating his alibi witnesses (Edenfield . . .) and not filing a notice of alibi defense in the omnibus pretrial motion that they filed before he dismissed them." Lyons v. Wilson supra, 2010 WL 2253751 at *7. Thus Lyons' petition was expressly based,

8

in part, upon a claim that police suppressed information regarding an alibi witness whose existence Lyons had previously acknowledged knowing of at the time of his trial.

On May 23, 2006, the Court of Common Pleas of Erie County dismissed the PCRA petition without a hearing. (Doc.86, Lyons Dep. at 21.) Lyons then appealed the PCRA decision to the Pennsylvania Superior Court. (Doc.86, Lyons Dep. at 20.) In his brief in the appeal from the PCRA decision, dated August 11, 2006, Lyons renewed the legal claim which he alleges he was prevented from presenting to the courts when he argued that the prosecution violated Brady by not turning over a police statement from Joan Edenfield which he claims had been withheld from him for years. (Doc. 86, Lyons Dep. Exh. 7 at 5-6.) On February 12, 2007, the Superior Court affirmed the judgment of the common pleas court in Lyons' case, rejecting Lyons' Brady claim on two grounds: First, the Superior Court denied this claim on its merits because Lyons, as the architect of his own defense, was fully aware of this alibi witness at the time of his trial and, therefore, suffered no prejudice. In addition, the Superior Court noted that Lyons had procedurally defaulted this claim since he failed to show why this issue could not have been raised on direct appeal in 2002. Lyons v. Wilson supra, 2010 WL 2253751 at *7. Lyons sought review of the

Superior Court decision but the Supreme Court refused to reconsider this ruling. (Doc. 86, Lyons Dep. at 21, 101, Exh. 10.)

**B.      Lyons Arrives at the Special Management Unit, SCI Camp Hill and Has Some of His Legal Materials Confiscated-April to August 2006**

While this Post Conviction Relief Act litigation was pending Lyons was transferred on April 5, 2006, to the Special Management Unit at SCI Camp Hill from SCI Fayette. The Special Management Unit at SCI Camp Hill was intended for housing and care of prisoners who "exhibit behavior that is continually disruptive, violent, dangerous or a threat to the orderly operation of their assigned facility." Beard v. Banks, 548 U.S. 521, 525 (2006) (internal citations omitted). As an inmate who was newly arriving at the Special Management Unit, Lyons was processed into that unit, and as part of this processing a property inventory was conducted by Andrew Huber, the property officer for the SMU at SCI Camp Hill. (Doc. 86-19.)

At the time that Lyons arrived at SCI Camp Hill, and his property was inventoried, the state prison system had policies in place which generally restricted inmates to possession of a limited quantity of legal materials in their cells. (Doc. 86-19.)  Because of his pending state cases, prior to arriving at SCI Camp Hill, Lyons had been granted a limited exemption to this policy. Moreover, shortly after his arrival at SCI Camp Hill, prison officials at Camp Hill also agreed that Lyons could

retain legal materials in excess of those normally permitted in the prison. (Docs. 86-24, 86-25.) While Lyons claims that he informed Huber of his entitlement to these exemptions, there is no evidence indicating that Huber received notice from prison officials of any exemptions from the policies for Lyons until months later in 2007. (Doc. 86-19 ¶16.)

Applying the existing prison policies, Huber conducted an initial review of Lyons' property on April 12, 2006. That initial review documented that Lyons possessed total of 76 linear inches of legal materials, approximately 25 inches in excess of the quantity of materials normally permitted for prisoners. (Id., ¶¶ 9-12.) In addition, Lyons possessed six videotapes. (Id., ¶ 10.) Applying the general prison policy, Huber confiscated the videotapes. (Id.) Huber also placed Lyons on notice that he had excess legal files, and provided Lyons with an opportunity to cull through those files. (Id.) When Lyons did not remove and dispose of excess legal materials, Huber prepared receipts, placing Lyons on notice that the videotapes and some of the legal materials that were deemed excess materials would be confiscated. (Id.) Lyons signed these receipts acknowledging that prison officials had taken these materials, and the excess materials were stored while Lyons exhausted administrative grievances relating to the confiscation of these materials. (Id.)

While Lyons pursued these grievances, he had the option to review his excess legal materials, and either cull these materials himself, or ship them out of the institution for safe-keeping. (Id., ¶13.) Lyons did not exercise any of these options, (id.), and his excess legal materials were destroyed after Huber was notified in August 2006 that Lyons' grievances had been denied. (Id., ¶14.)

**C.    Lyons Continues to Actively Litigate These Claims in State and Federal Court, 2006-2010**

Despite the confiscation of some of these legal materials, Lyons continued to actively, if unsuccessfully, litigate claims relating to his state conviction and sentence in state and federal court. Thus, in August 2006, Lyons pursued the appeal of the denial of his PCRA petition before Pennsylvania's Superior Court, arguing the legal claim which he alleges in this lawsuit he was prevented from presenting to the courts; namely, a claim the prosecution violated Brady by not turning over a police statement from Joan Edenfield, a potential alibi witness. (Doc. 86, Lyons Dep. Exh. 7 at 5-6.) On February 12, 2007 the Superior Court affirmed the judgment of the common pleas court in Lyons' case, rejecting Lyons's Brady claim on two grounds: finding first, that Lyons was fully aware of this alibi witness at the time of his trial and, therefore, suffered no prejudice; and concluding second that Lyons had procedurally defaulted upon this claim since he failed to show why this issue could not have been raised on

direct appeal. <u>Lyons v. Wilson</u> <u>supra</u>, 2010 WL 2253751 at \*7. Lyons sought reconsideration of the Superior Court decision but the Supreme Court refused to reconsider this ruling. (Doc. 86, Lyons Dep. at 21, 101, Exh. 10.)

Lyons then brought these same claims in federal court through a petition for writ of habeas corpus which he filed in the United States District Court for the Western District of Pennsylvania. In this petition Lyons, once again, renewed <u>Brady</u> claims relating to the suppression of information concerning a potential alibi witness, Joan Edenfield, and, once again, those claims were rejected on their merits. Thus, on February 10, 2010, United States Magistrate Judge Susan Baxter recommended that Lyon's habeas petition be denied on its merits, observing that:

> The Superior Court denied Petitioner's <u>Brady</u> claim on the merits because he was aware of his own whereabouts on the night in question, and therefore the Commonwealth did not suppress information unknown to him or that he could not have obtained himself with reasonable diligence.). Its decision was neither "contrary to" nor "an unreasonable application of" <u>Brady</u>. 28 U.S.C. § 2254(d)(1). Petitioner, his mother, and Reverend Cooley had contacted Edenfield at least four times. Under these circumstances, the Commonwealth was not obligated to disclose the police notes from its interview with Edenfield. <u>See, e.g., United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir.1977) ( "[N]umerous cases have ruled that the government is not obliged under <u>Brady</u> to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself."). Moreover, if Petitioner had been with Edenfield on the night in question, there was nothing that prevented him from informing the Commonwealth well in advance of trial that she would be an alibi witness. It was his fault that the jury did not hear her testimony, not the Commonwealth's fault. Finally,

considering the overwhelming evidence of Petitioner's guilt; that he gave the police, his supervisor, and a coworker an entirely different story about where he was on the evening of February 15, 2001, and why he was late for work that night; that Edenfield could not recall the exact date she allegedly met Petitioner; that her bank records, [and other records and evidence] do not show that she was with Petitioner on February 15, 2001-the Court concludes that the absence of Edenfield's testimony was not material to the defense. There was no <u>Brady</u> violation and the Superior Court's denial of this claim will not be disturbed by this Court.

<u>Lyons v. Wilson</u>, <u>supra,</u> 2010 WL 2253751 at *19.

This recommendation was subsequently adopted by the district court on June 2, 1010, and Lyons' petition was denied as meritless. <u>Lyons v. Wilson</u>, No. 07-214, 2010 WL 2253750 (W.D. Pa. June 2, 2010).

## F.    **This Litigation and the Pending Summary Judgment Motion**

While Lyons continued to actively pursue these claims concerning his conviction and sentence in state and federal court he also sued prison officials for allegedly interfering with his access to the courts, filing this lawsuit on December 17, 2007. (Doc. 1.) Lyons' complaint originally named five individual defendants. (<u>Id</u>.) On March 9, 2009, the district court, Vanaskie, J., entered an opinion and order dismissing all of these claims and defendants, with one exception. (Doc. 34.) The district court permitted Lyons to pursue a single claim of denial of access to the courts against one defendant, property officer Huber. (<u>Id</u>.)

14

At the heart of this specific claim is a novel legal assertion. Lyons' complaint is premised on his assertion that he lost both his state PCRA appeal and his federal habeas corpus petition, not because his claims were meritless, but because the confiscation of some of his legal files profoundly interfered with his ability to litigate these issues, causing procedural defaults by Lyons in this litigation. Huber has now moved for summary judgment on this claim, arguing that he is entitled to qualified immunity from liability since his actions did not violate any clearly established constitutional rights of the plaintiff. (Doc. 84.) This motion has been fully briefed by the parties (Docs. 85, 86, 93, 121,122,130, 132), and is now ripe for resolution.

For the reasons set forth below, we recommend that the motion for summary judgment be granted.

## III.     Discussion

### A.     Summary Judgment-Standard of Review

Defendant Huber has moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Rule 56, which governs summary judgment motions, provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## B. Qualified Immunity, Standard of Review

In order to establish a civil rights claim Lyons must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Lyons is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct. 808, 815 (2009). This doctrine, known as qualified

immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 129 S. Ct. at 815

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 129 S. Ct. 808; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. at

201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis

of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

## C. Legal Standards Governing Right-of-Access to the Courts Claims

Since Lyons' sole remaining claim in this lawsuit entails an assertion that Defendant Huber violated the Plaintiff's right of access to the courts when he confiscated these materials, any consideration of qualified immunity in this context calls upon us to also examine the contours of the constitutional right of access to the courts. Since 1977, the United States Supreme Court has recognized that inmates have a constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817

(1977). As the Supreme Court initially observed, this right of access to the courts is satisfied when corrections officials facilitate "meaningful" access for those incarcerated, either through legal materials or the assistance of those trained in the law. Id. at 827 ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.")

Two decades later, in 1996, the Supreme Court provided further definition and guidance regarding the scope and nature of this right of access to the courts in Lewis v. Carey, 518 U.S. 343 (1996). In Lewis, the court eschewed efforts to define this right in abstract, or theoretical terms, but rather cautioned courts to focus on concrete outcomes when assessing such claims. As the court observed:

> Because Bounds did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's . . . legal assistance program is subpar in some theoretical sense. . . . Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone," id., at 823, 97 S.Ct., at 1495 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the . . . legal assistance program hindered his efforts to pursue a legal claim. . . . . Although Bounds itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite. And actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which Bounds relied, see id.,

at 821-825, 97 S.Ct., at 1494-1497. Moreover, the assumption of an actual-injury requirement seems to us implicit in the opinion's statement that "we encourage local experimentation" in various methods of assuring access to the courts. Id., at 832, 97 S.Ct., at 1500.

Lewis v. Casey, 518 U.S. 343, 351-52 (1996).

Thus, following Lewis courts have consistently recognized several guiding principles which animate access-to-court claims by prisoners. First, such claims require some proof of an actual, concrete injury, in the form of direct prejudice to the plaintiff in the pursuit of some legal claim. See, e.g., Oliver v. Fauver, 118 F.3d 175 (3d Cir. 1997); Demeter v. Buskirk, No. 03-1005, 2003 WL 22139780 (E.D. Pa. Aug. 27, 2003); Castro v. Chesney, No. 97-4983, 1998 WL 150961 (E.D. Pa. March 31, 1998). Moreover, consistent with the Supreme Court's express view that " 'we encourage local experimentation' in various methods of assuring access to the courts," Lewis v. Casey, 518 U.S. at 352, courts have long recognized that public officials can provide meaningful access to the courts through a wide variety of means. See, e.g., Tinsley v. Del Rosso, No. 08-1251, 2008 WL 2236598 (D.N.J. May 30, 2008); Tormasi v. Hayman, No. 07-5683, 2008 WL 1995125 (D.N.J. May 6, 2008); Annis v. Fayette County Jail, No. 07-1628, 2008 WL 763735 (W.D. Pa. March 20, 2008); Hunter v. Shoupe, No. 06-1023, 2007 WL 120030 (W.D. Pa. Jan. 10, 2007);

Cook v. Boyd, 881 F.Supp. 171, 176 (E.D.Pa.1995); United States ex rel. Russell v. Hendrick, 376 F.Supp. 158 (E.D.Pa. 1974).

Finally, courts have held that to sustain such a claim a prisoner must also allege causation; that is, the prisoner must show a causal connection between the action of prison officials and the prejudice experienced by the inmate in some pending litigation. Thus, "actual injury, [is] a requirement of a claim asserting a violation of the right of court access." Mitchell v. Wydra, 377 F. App'x 143, 145 (3d Cir. 2010); see Butler v. Meyers, 241 F. App'x 818 (3d Cir. 2007)(denying inmate claim where causation not shown). As the appellate court has observed in this setting: "Prisoners have a fundamental right to access the courts. Lewis v. Casey, 518 U.S. 343, 346 (1996). However, a prisoner making an access-to-courts claim is required to show that the denial of access *caused* actual injury. Id. at 352-54.Actual injury occurs when a prisoner demonstrates that a 'nonfrivolous' and 'arguable' claim was lost because of the denial of access to the courts. Christopher v. Harbury, 536 U.S. 403, 415(2002)." Tinsley v. Giorla, 369 F. App'x 378, 381 (3d Cir. 2010)(emphasis added).

### D.   Defendant Huber is Entitled to Qualified Immunity

Judged against these standards, Defendant Huber is entitled to qualified immunity on Lyons' access-to-courts claim. At the outset, Huber is entitled to

qualified immunity on this claim, because Lyons has failed to establish the elements of a constitutional tort in this setting since he has failed to show prejudice to his litigation of these criminal caused by Huber's conduct, an essential prerequisite to such a claim.

Lyons has made no such showing, nor can he. Indeed, on this critical issue, Lyons' position is fundamentally flawed. Lyons invites the Court to find that his access to the courts was effectively denied, alleging that he lost PCRA claims relating to Brady issues concerning an alibi witness at his state trial on procedural grounds that he could have avoided if he had possessed all of his legal files when litigating these claims. This assertion–the legal and factual lynchpin of Lyons' constitutional tort claim in this lawsuit–is simply refuted by the record in Lyons' state criminal litigation.

Those state criminal proceedings reveal that Lyons knew of this alibi witness prior to his November 2001 trial. Moreover, Lyons had litigated contentions relating to this alibi witness as early as 2002 and 2003 in his direct appeal of his conviction. Since Lyons demonstrated a thorough knowledge of this witness and the legal issues relating to this witness years before his transfer to SCI Camp Hill, it is difficult to understand how events at SCI Camp Hill in 2006 could have materially prejudiced his ability to present his longstanding claims concerning this witness.

Furthermore, an examination of the rulings made by the courts in Lyons' PCRA appeal and federal habeas corpus proceedings reveals that Lyons is simply wrong when he suggests that he did not prevail in this litigation because he lost these cases on procedural grounds due to restricted access to his legal materials. Lyons cannot fairly attribute his failures in this litigation to procedural obstacles caused by the actions of prison officials. Quiet the contrary, Lyons lost these cases because a fair and dispassionate assessment of the merits of his claims, by both state and federal courts, revealed that Lyons' arguments concerning his alibi witness were wholly without merit.

Indeed, Lyons' claims concerning this witness failed on several scores, in ways that were entirely unaffected by Lyons' access to his personal files. First, the witness, Joan Edenfield, was not in any true sense an alibi witness since "Edenfield could not recall the exact date she allegedly met [Lyons and] her bank records, [and other records and evidence] do not show that she was with [Lyons] on February 15, 2001 [the night Lyons allegedly raped an eight year old girl]."Lyons v. Wilson, supra, 2010 WL 2253751 at *19. Moreover, to the extent that Edenfield could have provided an alibi for Lyons, knowledge of that alibi was a fact peculiarly within the province of Lyons himself, who knew precisely where he was on the night of the crime, something that the courts have repeatedly noted when rejecting this Brady claim.

Indeed, it is absolutely clear that Lyons did know of this potential alibi witness, since he attempted to call her as a witness at his trial.

Furthermore, as the state and federal courts have repeatedly observed, Lyons' argument on this alibi witness issue ignores the overwhelming evidence presented at his trial linking him to this crime, and completely discounts the fact that any alibi proffered by Lyons through this witness would have been the fifth different alibi presented by Lyons in an effort to explain his whereabouts on the night of this crime. In short, Lyons' access to courts claim fails as a threshold matter because there is nothing about the actions of property officer Huber that prejudiced Lyons' litigation of this alibi claim in his PCRA and habeas corpus cases. Rather, Lyons lost these cases because, in the judgment of the courts, both the facts and the law compelled the denial of these meritless claims. On these facts, defendant Huber simply cannot be held accountable for the outcome of Lyons' unsuccessful PCRA and habeas corpus litigation, and certainly could not have recognized that his actions applying prison policy would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, the February 11, 2011Defendant is entitled to qualified immunity on this claim.

In addition, Defendant Huber is entitled to qualified immunity because the policies he was applying, limiting the volume of legal materials that inmates can possess to approximately 50 linear inches, are reasonable measures that have been repeatedly upheld by the courts. State inmates in Pennsylvania, like Lyons, have in the past often invited federal courts to entertain orders directing their jailers to allow them greater access to legal materials. Yet, these requests, while frequently made, have rarely been embraced by the courts. See, e.g., Kerschner v. Mazurkewicz, 670 F.2d 440, 443 (3d Cir. 1982)(affirming denial of prisoner motion for preliminary injunction seeking greater access to legal materials); Edmonds v. Sobina, 296 F.App'x 214, 216 n. 3 (3d Cir. 2008); Barnes v. Quattlebaum, No. 08-2197, 2009 WL 678165 (D.S.C. March 12, 2009); Clay v. Sobina, No. 06-861, 2007 WL 950384 (W.D.Pa. March 26, 2007); Wesley v. Vaughn, No. 99-1228, 2001 WL 1391254 (E.D.Pa. Nov. 7, 2001). Instead, these courts have repeatedly upheld as reasonable prison policies concerning access to, and the storage of, legal materials that are essentially identical to those at issue here. For example, in Barnes v. Quattlebaum, No. 08-2197, 2009 WL 678165 (D.S.C. March 12, 2009) and Wesley v. Vaughn, No. 99-1228, 2001 WL 1391254 (E.D.Pa. Nov. 7, 2001), courts expressly sustained policies, identical to those applied by Defendant Huber, limiting an inmate to storage of one box of legal materials in his cell per month.

Thus, at the time of these events, federal courts had repeatedly upheld the right of prison officials to impose reasonable limitations on the volume of legal materials which an inmate could possess in prison, and had actually sustained the constitutionality of policies similar to those applied by Defendant Huber when he confiscated excess legal materials from Lyons, and notified Lyons that he should either review these materials or arrange for them to be shipped outside the prison. In this setting, where prison officials are applying a legally valid prison policy which authorizes confiscation of legal property, courts have held that officials applying the policy are entitled to qualified immunity from damages, Frazier v. Diguglielmo, 640 F. Supp. 2d. 593, 600-02 (E.D. Pa. 2008) since they could not have recognized that their adherence to a constitutionally valid prison procedure would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).

Lyons cannot defeat this claim of qualified immunity by arguing that Huber erred in his application of this valid prison policy because he failed to confirm that Lyons had received a limited exemption form that policy. In this setting, inadvertent errors in applying an otherwise valid agency policy are not matters of moment in analysis of a qualified immunity claim. Therefore, a failure–like the failure claimed here–which simply involves alleged non-compliance with agency policies, practices,

or procedures does not defeat a qualified immunity defense when the Plaintiff's constitutional rights were not clearly established. See, e.g., Davis v. Scherer, 468 U.S. 183 (1984); Bradley v. United States, 164 F.Supp.2d 437 (D.N.J. 2001).

In sum, for the past ten years Eric Lyons has attempted to elude the legal consequence of a jury's finding that he indulged in the cruel, calculated kidnaping, rape and attempted murder of an eight year-old girl on a cold February night in Erie, Pennsylvania. Throughout these efforts, Lyons has repeated a consistent refrain, blaming others for his legal dilemma. This refrain was central to his direct appeal, which blamed the trial judge for excluding his alibi witness, Joan Edenfield, at trial. It was a refrain that Lyons repeated in his state PCRA and federal habeas corpus litigation, when Lyons blamed the state for concealing information concerning this alibi witness from him. It is now a refrain that Lyons asserts in this civil lawsuit, where he contends that he lost his PCRA and habeas litigation because he was limited to possession of approximately 50 linear inches of legal materials when prosecuting these post-conviction claims.

It is, however, a refrain that has not grown persuasive through repetition. The truth is that Eric Lyons cannot point to others as the cause for his current legal dilemma, he must look within himself. Facts are stubborn things. In this case, the facts are that every court which has considered Lyons post-conviction claims has

rejected those claims on their merits, citing the overwhelming evidence of Lyons'

guilt and the immutable fact that Lyons' complaints regarding his alibi witness are

entirely unpersuasive since Lyons both knew of this witness, and knew where he was

and what he did on the evening that this crime occurred. It is this array of stubborn

facts that consistently defeated Lyons' post-conviction litigation from 2002 through

2010. It is this array of stubborn facts which now conclusively demonstrates that

Lyons cannot show the type prejudice and causation which is essential to a claim that

he was denied his constitutional right of access to the courts. The truth, the stubborn

fact, is that Lyons has had full and untrammeled access to the courts over the past ten

years, but that access to the courts could not erase the fact that the evidence in this

case has been found by every court to overwhelmingly demonstrate Lyons' his guilt

of these cruel crimes.

### IV.    Recommendation

For the reasons set forth above, IT IS HEREBY RECOMMENDED THAT

Defendant's motion for summary judgment (Doc. 84) be granted.

The parties are further placed on notice that pursuant to Local Rule 72.3:
Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen
(14) days after being served with a copy thereof. Such party shall file
with the clerk of court, and serve on the magistrate judge and all parties,
written objections which shall specifically identify the portions of the

proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 11th day of February, 2011.


*__S/Martin C. Carlson__*
Martin C. Carlson
United States Magistrate Judge